Please all rise. Hear ye, hear ye, hear ye. This Honorable Appellate Court for the 2nd Judicial District is now back in session to pursue its adjournment. And I will now proceed to custody of the presiding judge. All right, thank you. Please be seated. Your Honor, in the case of your daughter, 2-F-16-0-1-5-0, in the name of the Mayor himself, do we any of the following petitioner and appellee, and if not for your will do so, respond in the name of the Court. I will be on behalf of the Honorable Appellate, Mr. Robert D. Black. I will be on behalf of the petitioner and appellee, Ms. Emily Farrar. Mr. Black, on behalf of the Appellant, you may proceed. Thank you. You may please support. Thank you. Again, my name is Robert G. Black. I represent the Appellant in this matter, who I'll refer to by the shorthand of Norf. There are several issues... Can we refer to him as Norf, sir? Pardon me? With your permission, we can refer to him as Norf as well. That would be fine, Your Honor. Okay. There are several issues that we've raised here. One of the issues that we've raised has to do with the separation between parties following a dissolution. The goal here is always the financial independence, separate and independent. What has occurred here, however, is that has not been followed because we have a situation here where as it currently stands, the business was awarded to Norf. The holding company for the land was awarded to the appellee, to Julie, if I may. What has happened there, then, is that the business and the other business entities do business on the land that's owned by the holding company, the land holding company. What you effectively have here, as it currently stands, is the ex-wife in the possession of the property as landlord to the ex-husband with the business on that property as tenant. We have raised this in our brief as being... Do you suggest there could be some kind of a conflict with that situation? I'm suggesting it's ripe for conflict. I'm suggesting that it is against the goal of separate and independent. We have also... But, Mr. Black... Yes, Your Honor. Separate and independent means that the party's in their... in the personal situation that they found themselves in. Correct. And this one is interesting. Yes. That they aren't in that situation anymore. And they aren't. Furthermore, just looking at the record, there has to be a division of property. Correct. And if the evidence is taken literally, there is no money to pay one party or the other to be outside of the realm of togetherness business-wise. So, I realize that we all have magic wands, we judges, but my guess is the trial judges was out of order and I certainly think mine is out of order to find the money to do this with. So, how do we do it? Well, the split ended up being 55-45 percentage-wise to the ex-wife based upon the valuations of the trial court. Which the trial judge... Let me interject for a second. The trial judge found that the company was owned by North and Julie, correct? That was the trial court's finding. That is correct. And the standard that we review that by is the manifest weight of the evidence standard, correct? Yes, it is, Your Honor. So, for us to overturn that decision, we would have to find that an opposite conclusion to that found by the trial court was clearly apparent. Correct, Your Honor. It's a fairly substantial hurdle, isn't it? It is, Your Honor. What we are arguing about under the manifest weight of the evidence standard here is that we have the one exhibit, exhibit 53, that is a purported evidence of a transfer of shares. That transfer of shares as purported evidence failed to follow the corporate bylaws. It failed to follow the corporate bylaws for several reasons. For the lack of a seal, for the lack of proper signatory, and for the lack of an enactment on books. There's no evidence of record of an enactment on books. And your reference is to the unsigned corporate bylaws? My reference is to the unsigned certificate. Nothing's really signed anywhere, right? Nothing's signed anywhere. So you trust what the document that you say is unsigned, but don't trust the other documents? Well, the bylaws, I'm not recalling that those are unsigned or needed to be signed. I apologize if my recollection is not 100% there. I know that the trial court did recognize that there was a lack of proper signature in terms of the certificate. What I'm saying is that the bylaws here were not followed, were not complied with, and there was evidence of record otherwise that my client's mother, the family, intended to keep it and did keep it. I don't want to test your memory too hard. I'll try my best. It's a multiple choice question, though. It's just a joy. Is there a corporate book? Are there signed bylaws? Was there ever a meeting? Was there ever anything that would indicate that this is really a corporation other than the website? There was an initial meeting, Your Honor, towards the initial incorporation. There was a meeting at that point, and the record discloses that. Beyond that, the record is unclear. So could we use the phrase that the traditional formalities of corporate formation were not really followed? The trial court found that there was, in fact, a corporation here, and I don't think that the existence of the corporation is in dispute. Well, it might be if you are saying that this transfer or this granting of shares did not follow the corporate structure, because our corporate structure, aside now from your memory that there was a meeting, has never been clearly manifest in any documents other than the transfer. The surrender may be not, but the transfer or vice versa, because now my memory is confused. Well, we can go back to that certificate that is an exhibit of record that doesn't contain the seal. It doesn't contain any initial signatures. It was issued a series 001, 100 shares, to Antonia, my client's mother. There is what appears to be a couple of signatures in 1985, and beyond that, nothing. Well, how does the North hold himself out? How does he hold his company out to the general public? Doesn't he hold himself out as the owner of the corporation? He started it with his father. His dad left in 1985. Isn't that the way he holds himself out to the general public? I think he holds himself out from the record as operations director. He started the business with his dad in 1979. His dad started the business in 1979. He started it with his dad. According to the website, which we can take judicial notice of. All right. Well, and I will say that starting the business is, in terms of family member employee, is consistent with the testimony that he has been in charge of operations, getting clients. There's a testimony of record here that discloses that throughout, he was doing some labor, but most of it was bidding and getting the clients. Mr. Black, in the trial court's finding that the company was owned by North and Jewel, you're taking issue with that? Yes. Let me ask you a point of question. How do we find that that conclusion is erroneous in light of all the income tax returns filed over the years under threat of perjury that the company was owned by both North and Jewel? So how do we ignore all those income tax returns? I'm not asking the court to ignore the income tax returns. I am saying that the income tax returns is part and parcel of everything that the trial court considered. The trial court relied extremely heavily on Exhibit 53, which was the signed stock certificate. So we have, on the one hand, we do have tax returns that my client testified to were developed by the accountant. That he signed? That he signed, yes. On the other hand, you have the expressed testimony that the family did not transfer ownership here, that the mother owned it throughout, that the mother did not transfer ownership here. That in 2006, my client asked for the corporation to be transferred to him or otherwise, and then that request was rebuked. It's all part and parcel of the evidence here and what we're arguing under, as we must, a manifestation of the evidence standard. Your client disputed that his wife worked for the company, correct? He said she was just, she got Social Security just to keep up with Social Security. There's testimony of record that my client stated that he did not really perform much for the company. Correct. But Mike's wife, Deborah, testified that Julie did, in fact, work for the company, in fact, Julie trained her. Deborah's testimony was, in fact, that Julie trained her, correct. So, you know, to follow up on Justice Hudson, how do we say that the trial court's findings against the manifestation of the evidence, when you have that kind of testimony? You've got public records, tax returns, and testimony from another person who worked for the company, that Julie did, in fact, work there consistent with her testimony. And you also have my client's brother's testimony, Michael, that said, I don't remember signing anything. You're not fact finders. I know that. I know. Your Honor, we're saying that under the manifest way to the evidence standard, there is not enough here for the trial court to find as it did, and that, in fact, the trial court gave undue reliance to one single piece of evidence that is, in fact, unliable. To be fair to you now, since the point has been raised, can you tell us in summary form what factors would undercut the trial court's finding? What factors can you point us to to establish that Julie did not have an ownership interest in the company? Well, I've alluded to some of those factors, but I think the primary factor would be the testimony of the family that we never gave it up. We always continued to own it. We do have the brother's testimony that said, as to this 1985 certificate, I don't remember signing that. My mother never did this, that his testimony was consistent throughout as to the structure of the company, how it began, how it was run, who ran it, that the father wanted it as a legacy to eventually pass down to his children. We have the testimony of North that there was aspects where he was investigated by the union as to whether he had ownership or not in 2003, and they decided the day that he did not have an ownership interest in 2009, they said that he was basically within his operational function too close to there to remain part of the union. But all along here, there is, beyond that piece of evidence and the tax returns, there is consistent evidence that the ownership remained with the family. Let's talk about that because it seems to me a fair reading of the evidence in the record is for every factual assertion on one side, there's conflicting evidence on the other side. And it would appear that North's mother, Antonia, was at one point the rightful owner of the shares of the corporation. Correct. But then we see, as you know, she twice signed her name on documents purporting to show she surrendered the shares. That doesn't support the argument that she was the owner at all times. That would evince an intent to surrender the shares. What do you make of those purported surrenders? Certainly, Your Honor. I'm not certain of the second signature issue there. I'm only aware of the first signature issue there, which would be that 1985 transfer. Well, the second year, it is signed by the mother, Antonia. Right. In 1985. Correct. Right. So I'm assuming Your Honor refers to the first signature which was received by the shares. Correct. Now I lost my train of thought when I was asking that question. Would you mind, Your Honor? How do we find that she retains ownership of this corporation continuously in light of the document purporting to be the surrender? That was the question. Well, and I'm not 100 percent certain how much this comes out from the record. And I believe it does, that my client's mother, the English is not her first language and that she doesn't read English. I'm not, well, there are factors there that go into what happened here. And the later indicia doesn't support a transfer. In 2006, when North said, you know, I'd like the company now. This is, you know, I've been doing this for a long time now and I'd like the company. And that request was, again, rebuked. Let me cite back you with the original question that give us your most compelling argument as to why North remained the sole owner, whereas Mother did and Julie had no interest in this corporation in light of the tax returns. The most compelling evidence, Your Honor, is the testimony. But that would be subject to trial court's credibility assessment, would it not? It would. It would, but there is no contradictory evidence in terms of the mother disagreeing that she retained, no contrary testimony, though, is that she retained ownership throughout. You have a signed assignment of the stock in 1985 to Julie, which is at the same time that Giuseppe left. That he left, they both left for Italy, correct? Yes. So that's completely consistent with Julie's position that they turned the company over to them, to Julie and North. But if you recall also, my client's father's testimony was that while they were in Italy, he still kept tabs on the company, still wanted to know what he was buying out of it. Which goes back to Justice Hudson's point. You've got conflicting evidence all over the place. And our position is that the reliance upon that one piece of documentary evidence was given undue deference, undue weight. Mr. Black, you make a point in your brief that there was some effort to keep Antonio and Giuseppe from participating. Or that their due process rights is something. Correct. During this period of time, I understand that English is not their first language, but they have two sons who apparently speak English fairly well. And what prevented them, if anything, from intervening if this was their business and they wanted to make that point clear to the court? I don't have a direct answer to that, Your Honor. Antonio is not my client. I do not have a direct answer to that. I think that part of the response is that once this came down the way it did, or looked to be coming down the way it did, she should have been made a necessary party to this action. Well, we have parents intervening in divorce cases all the time, as you're aware. I understand. And they're not necessarily made a necessary party. Correct. And the fact that they're not made a necessary party is also somewhat telling, I think, in this case, because there's nothing that prevented Mr. LaRusso from making anybody a necessary party. But they then chose not to otherwise participate until they were called to testify. And so I understand the problem with the language. I understand the problem that they're thousands of miles away in Italy. But if they own this business, or even if they gave this business to their son, which is also in some dispute, they had the ability to be there and to make that point, and they did not. Right. Shouldn't we consider that? I don't think that should be considered, Your Honor. I know that there are times when people jump in and intervene. I'm not sure how many times it is where a business ownership, a family business ownership, is in direct dispute. And the position would be that the trial court should have brought them in before it could adjudicate ownership in a company that was claimed by the parents. Does the trial court have to make that motion? It's not necessary for the trial court to make that motion, Your Honor. And I have one last question. I am a firm believer in alternate pleadings. I think that's important. Yes, Your Honor. Any case. But alternate, asking this court to make alternate findings that have no basis, I mean, it's owned or it's a gift. Those are the two issues. Right. It can't be both, I don't think. But yet, that's the argument. I own it this way, but it was given to me as a gift. The alternative argument, if I can try and extrapolate that for Your Honor, is that if this court were to determine the manifest weight standard, that it wasn't transferred to Julie, but that there was sufficient evidence that the ownership was in North, then that would be a gift. Thank you. Thank you, Your Honor. Thank you very much, Mr. Black. You'll have an opportunity to address the court again in rebuttal. Thank you, Your Honor. Ms. Carrara, on behalf of the appellate. Good morning, Your Honors. May it please the court and counsel, my name is Emily Carrara, and I represent the appellee Julie Russo. And if I may, I will refer to her as Julie. Julie and North started Russo Cement in 1979. Now, while Antonia might have had the shares of stock in her name, you have to look at the intent of the parties throughout the entire marriage with respect to the ownership of Russo Cement. However, there is a plausible argument starting out, though, since Antonia had the shares of stock in her name, that she was the ostensible owner initially, correct? Essentially, in the beginning, she was. And I think if you look at the record, the reason that they did that was because North and Julie didn't have any money, that they were just starting out, and that they needed Giuseppe and Antonia to help them out and start the business. They also put Antonia on as the sole shareholder and president for, that was something they indicated, that what Italian families do. That's what the record indicated. However, if you look at the actions post-1985, after Antonia surrendered her shares of stock to Russo Cement, and Russo Cement issued a new stock certificate to Julie, you have to look at the intent of the parties. You do have a document. But I think what's most telling, especially in family law cases, is how is the property treated? And the parties treated this as their marital property, as Your Honors have noticed. They filed joint tax returns, including under oath that they are the owners. They worked the business. They claimed ownership interest in it, meaning that they took distributions from the company. They invested their funds in the company. Did Antonia and Giuseppe continue to take distributions from the company after they left for Italy in 1985? They did not, Your Honor. No evidence of that? No evidence of that at all. And, in fact, there was testimony through Debbie LaRusso, as well as Julie LaRusso, in that Giuseppe was paid funds back for his investment in LaRusso Cement in 1985 before he left for Italy. And I guess to address the issue of counsels indicated that the trial court's decision was against the manifest way to the evidence, which is a very large hurdle to overcome, that based upon the fact that let's look at the testimony of the parties. Well, I think if you look at the testimonies of the parties, it's contradictory to his argument. So the testimony that the court heard was of North, Julie, North's brother, Michael, North's parents, who barely speak any English, and Julie's family. Now, the trial court noted in its opinion and ruling that they did not find North to be credible, that his testimony was not within the bounds that he believed, that the judge believed that it was proper. Now, Michael testified. I think he was very polite in saying North's testimony was not persuasive. That's correct. You can't call him a liar. That's correct. That he's not persuasive. That's correct, Your Honor. Now, Michael did testify that in 1990, him and North became 50-50 owners of LaRusso Cement, and he testified that they paid money to Giuseppe for that interest. And then later, Michael tried to have North buy him out of the business. North refused to give him any money. But Michael left, and then sole ownership was in North's hands. With respect to the union, that's very telling, I believe. In 2009, the union rescinded North's membership because he was the owner of LaRusso Cement. Anything that happened in 2003, that was just an investigation that they had done. So the testimony of North, I don't believe that this Court can rely upon in making a determination whether this is a marital asset or not. The trial court did not make any specific finding about Julie's testimony that I could find. So does that mean that we should then consider her testimony, even though that testimony is even inconsistent with some of the documents? I think most telling is the documents themselves. I think the testimony can go either way from both parties. But I think if you look at the intent of the parties, what the intent was in the documents, specifically the tax returns, they signed those under penalties and perjury of law that this was their company and that they owned it. Let's talk about that for a second. Obviously, to represent something to the IRS that is inaccurate is a very dangerous proposition. That's correct. We can all agree. But sometimes some people may do something for one purpose, and yet it would not be consistent with another. So my question is the fact that they made those representations on some of the tax returns that they were the joint owners of the company. Does that in and of itself establish the facts, or is it simply another item of evidence to be considered? I believe it's an item of evidence to be considered. But in addition to that, let's look at their actions. Let's look at the website. North is holding himself out as owner. They formed the company during the marriage. They both worked at the company. Was the website referred to at the trial? It was not. But I believe Your Honors can take judicial notice of it. There's a debate about that. I know some federal judges think we can look at the whole world, but if the parties don't raise it or introduce it at trial, we should ignore it. I think you can look at the entirety of the situation in making your determination. North testified that basically he and his dad began the business in 1979, correct? That's correct.  That's correct, Your Honor. So in any event, no matter what the documents might say, the business, when it began, occurred after the marriage. That's correct. And then ownership, if at any point in time, ownership transfers to North, it's to Julie as well. That's correct, Your Honor. That's correct. And the presumption of the marital property. If Antonia started out, I want to point out in this point, as the owner of it, give us your strongest argument as to when she divested herself of the ownership of the corporation. She divested in 1985 when she signed the stack certificates, rendering it to LaRusso Cement, and then reissuing when the stack certificate was reissued to Julie. I think when you look... Was it reissued to Julie? It was reissued. If you look at the stack ledger, the stack was reissued to Julie. On the corporate books? The stack ledger is contained in the corporate books. So, and counsel had brought up the issue of the trial court didn't separate the parties, that they were joined at the hip. That, I think, is an unfair characterization of what happened at trial. Justice Hutchinson, you were right. There's no money in this case. So we had to, the judge had to allocate the businesses in some sort of fashion. And, in fact, the judge did it to separate the parties. There were four businesses involved in this. There was LaRusso Cement, Dirt Works, Safety Lane, and Safety Lane. So what happened was the trial court awarded to NORC LaRusso Cement, Tri-City, which was, NORC testified that it was more of an investment. Dirt Works, which was a company that apparently held the equipment for LaRusso Cement, and Safety Lane, which Mr. LaRusso's expert testified that it's tied into LaRusso Cement. So all of the Okay, how would you characterize Onofrio Land? Onofrio Land is an entirely separate entity. But that's another piece of property or piece, it's another entity. It's another entity, correct. Considered in this mix. But it's not closely tied to LaRusso Cement because what it is, it is a holding company for the land that these businesses are on. However, there are other tenants. And in the balance sheet, there's notes receivable. So that's not the only thing that the group Onofrio Land has. And the relationship between Julie and NORC, I understand the goal is to do mutual independence of the parties. But they're not tied at the hip here. Julie is the landlord. All NORC has to do is pay rent. And in fact, if Julie wanted to, she could have someone come in and manage the company and they wouldn't have any interaction at all. So I think that argument in and of itself is disingenuous. What about, you know, the trial court can't, the trial court could have ordered everything sold. And that would have ended the relationship provided they could find purchasers. Correct. But again, is what would have been the purpose in doing that other than creating some element of cash, probably nothing close to what the businesses might be worth. That's correct, Your Honor. And that's why I believe that the trial court separated the entities as the way that he did. What about the values of the businesses, the values of the entities? I mean, there is an argument about that, that Mr. Gould or Gould, I'm not sure how. Gould, I believe. Okay, Gould. And Mr. Kleeman do not come to the same place because one considers them ongoing, which apparently the judge did, whereas Mr. Kleeman was looking at fire sale value, so to speak. That's correct. Under these circumstances, which one seems to be a better option in light of the testimony? I think in light of the testimony, the trial court is granted great deference for taking a determination as to the value of an asset. They are able to observe the demeanor of the witnesses, review their reports, determine whether they are credible in their field. And I think that's what Judge Cerny did. He believed that Judge Gould's valuation of the company, I mean, I'm sorry, probably Lee Gould's, valuation of the company was stronger than what Mr. Kleeman's was. And I think valuing a business is an art. It's not a science. There is an exact formula that you can look to. And I think the trial court has specific discretion in order to formulate some sort of value of a company using the evidence that it's presented with. Well, I think there's also an issue that Mr. Gould was pretty straightforward saying, I don't think I've done any cement businesses before, but Mr. Kleeman had some background in similar types of businesses. Did the court take that into account? Well, my guess would be is it did because the court heard the testimony of both experts and reviewed the valuation reports. And I think it's important to note specifically with respect to the evaluators and how much information they were given to do their valuation. And then I think it's important to note that it took a long time and many discovery motions for Mr. Gould, for us to file for Mr. Gould to get the necessary documents he needed in order to complete his valuation report. And, in fact, the only time that he was able to speak with North regarding the business was during a time-limited deposition. When, if you look on the flip side, testimony was presented by Mr. Kleeman and noted by the trial court that Mr. Kleeman had unfettered access to North. He sent him e-mails. They talked on the phone. He went and visited him several times. There was even testimony that Mr. Kleeman and his counsel in North had dinner together. So I think that's also very telling in giving the weight to the credibility of the reports. In terms of bias or interest of the witness in taking the consideration met? I believe so. And, in fact, Mr. Gould was not even given the appraisal of the value of the equipment. He had asked several times for appraisal reports of the equipment, and North had consistently said, no, there isn't any. But when reviewing Mr. Kleeman's report, he noticed that there were value. There were appraisals. And so even testifying, Mr. Gould indicated that if he had been given the information that Mr. Kleeman had, his value would be higher. So the court did have different avenues on how to value LaRusso cement. I think that also leads us to the court's valuation of Onofrio land. There is an argument that Onofrio land was overvalued, that the trial court didn't take into consideration certain notes payable in determining or notes receivable in determining the value of Onofrio land. And I think that argument is disingenuous. Mr. Gould testified as to the value of Onofrio land. He looked at the balance sheets of the company. The company itself had certain real estate holdings as well as notes receivable. Mr. Kleeman, I'm sorry, Mr. Gould testified that in the value, when he determined his value of Onofrio land of approximately $2 million, he took into consideration all of that with respect to, and also a discount. However, in his testimony, he indicated, hey, I have some concerns about these notes receivable. You know, someone's in bankruptcy, another one died. You know, so my concern is how much of an asset of the corporation is it? And I think Judge Cerny did take that into consideration in determining the value of Onofrio land. North argues that Julie was awarded 55% of the assets and he was awarded 45% of the assets. That argument is entirely disingenuous. The trial court has granted great authority and discretion in order to make and determine values of assets to be divided and divorced. And, in fact, one of the assets that Julie was awarded was a note from Onofrio land owed to North. So it's like $1.5 million. And, in fact, North testified that Onofrio land doesn't owe him any money. So you actually subtract that $1.5 million, which is not an asset, from the distribution of the estate, it ends up that North would have been awarded more than Julie. It would have been 58-42. So I think the factors that the court needs to look at is the discretion of the trial court, that the court was in the best position to determine the values of the property, how they should be distributed between the parties, which would cause the least amount of animosity. To say the least, this was a very contentious divorce. So the trial court, in its discretion, properly divided everything so that the parties could separate. The point would be this is not a community property state like California. The statute does not mandate a 50-50 split. It's to be an equitable distribution under all the circumstances. That's correct, Your Honor. That's correct. And, in fact, the situation was equitable. The assets that were awarded were proper for each party. North has also argued that, with respect to LaRusso Cement, that that was a gift to him from Antonia. And that argument fails as well. And the reason it fails is, to be a gift, it has to be donative intent as well as delivery. That was not the case here. Did Antonia testify on that issue as to whether or not she intended to make the gift? She did. She did, and she absolutely testified that the business was her business and that she did not give it to North. There was also testimony that North testified himself that his mother wouldn't give him the business. So to say that there was a gift is disingenuous because there was no intent. And there also was no delivery. In fact, the delivery, if there was a delivery, was to Julie herself and not to North. And Julie does not make the argument that that now became her non-marital property. And I think what's most important for Your Honors to look at on review is not whether you agree with the trial court, but rather if the trial court, within its discretion, acted arbitrarily, exceeded the bounds of reason, or ignored the principles of law so that substantial injustice was incurred. And that's not the case in this matter. Thank you. Thank you very much. All right. Thank you very much, Ms. Carrero. Mr. Black, you may adjust at court and rebut. Thank you, Your Honor. If I may, I'll begin with valuation. We have the testimony of Mr. Gould, who utilized what he described as the adjusted net asset assessment or methodology. And by that methodology, he uses the liquidation value of the company assets minus its liabilities. Mr. Kleeman utilized the liquidation value method and said, what I come up with then would be reduced by the liabilities. There is really no discernible difference between what they're talking about, other than the numbers and figures that they reached. However, the trial court said, well, I'm going to disregard Mr. Kleeman, not because Mr. Gould is more, well, I'm going to disregard Mr. Kleeman because there is no evidence here that this company is going to be liquidated, and therefore I can't assess liquidation. Gould value is an ongoing operation, which it is, correct? That's correct. All right. So what was wrong with that? There's nothing per se wrong with that. What the trial court said was, I'm not going to give any credence to Kleeman because Kleeman used liquidation, and this is still an ongoing operation. Whereas Mr. Gould did, in fact, in his net assets approach, had to utilize liquidation. They came to vastly different numbers also. Mr. Gould stated as an adjusted net asset that the resource amount was 1.682. Mr. Kleeman, using his liquidation method, said it's 1.7 minus unfunded pensions, and then there was testimony of the unfunded pensions, the remaining liabilities there. Should that be the case as of the date of valuation, we come to $876,000. So, yes, there is issues there with the valuation. I think that the trial court unduly gave much too much weight against, if I may, somebody saying that it's liquidation because the company was still going, when, in fact, they both used aspects of liquidation minus liabilities. But possibly what Mr. Gould didn't use was these unfunded pension liabilities that we don't know much about other than we know there was a figure that was used. My client testified to the figure as to each one. That is correct. Was there documentary evidence supported in support for that, the unfunded pension liability, or was it just Thornton's testimony? It was his testimony. It was his testimony. In terms of... And did he ever sit down with Mr. Gould and explain that, or was that something that came up at the deposition? I don't believe it came up at the deposition. I don't believe that it was something that was questioned with him. I think there's been a little bit of undue credence given to additional time that apparently was spent by one versus the other. Mr. Gould did have the opportunity to review the paperwork. He did have the opportunity to do the questioning during the deposition, and this is how things are done. In terms of the...  If we have a situation where, while we're trying to make sure that these parties are financially independent, there's still some interdependency based upon the basic landlord-tenant relationship here. Part and parcel of everything in terms of going back to the trial court would be to reevaluate and reassess that and see where we go there. We're also contesting the valuation of an off-real land based upon Mr. Gould's assessment, again, adjusted that asset as for now, I'm trying to say that, in that regard. As to the... Why would you add those back into the value if one's in bankruptcy, those three, Well, they should be netted out, zeroed out. Okay. In terms of the overall structure, and I think Your Honor has evidence here, and as to ownership, Your Honors have identified different factors here in the conflicting testimony. I believe Your Honor was correct that tax returns, while they are part of the record, are not the higher part of the totem pole in terms of considering what everything is going on. But, and this is, I think, at least as I read Judge Cerny's memo, I don't believe, I can't, he was polite. He's not persuaded by, I don't know if, really wasn't persuaded by Michael or Debbie. He didn't say much about Julie. And the only thing that stands are that certificate and the tax returns that have their signatures on them that indicate some manner of ownership. And the testimony of my client's parents. Okay. I don't think he spoke about them, but yes, there is that. Okay. Thank you very much. Thank you, Your Honor. I'd like to thank both counsel for all their arguments here this morning. The matter will, of course, be taken under advisement. A written disposition of the court will be issued in due course. We stand in brief recess to prepare for the next case. Thank you.